# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

IMATION CORP.,

      Plaintiff,

        v.

KONINKLIJKE PHILIPS ELECTRONICS
N.V., U.S. PHILIPS CORPORATION,
and PHILIPS ELECTRONICS NORTH
AMERICA CORPORATION,

      Defendants.

KONINKLIJKE PHILIPS ELECTRONICS
N.V., U.S. PHILIPS CORPORATION,
and PHILIPS ELECTRONICS NORTH
AMERICA CORPORATION,

      Counterclaim and Third-Party
      Plaintiffs,

        v.

IMATION CORP.,

      Counterclaim Defendant,

       -and-

MOSER BAER INDIA LIMITED, GLOBAL
DATA MEDIA FZ-LLC, MBI INTERNATIONAL
FZ-LLC, MBI INTERNATIONAL SERVICES
PRIVATE LIMITED, MBII INDIA MARKETING
PRIVATE LIMITED, GLYPHICS MEDIA INC.,
and MEMOREX PRODUCTS, INC.,

      Third-Party Defendants.

CIV. A. No. 07-3668
(DWF/AB)

**IMATION CORP.'S
MEMORANDUM OF LAW
IN OPPOSITION TO
PHILIPS' MOTION FOR
JUDGMENT ON THE
PLEADINGS**

**PORTIONS FILED UNDER
SEAL PURSUANT TO
PROTECTIVE ORDER**

**TABLE OF CONTENTS**

Page

INTRODUCTION........................................................................................ 1

LEGAL STANDARD ................................................................................. 2

ARGUMENT ............................................................................................. 4

I.  The Parties Intentionally Granted Each Other Broad Have-Made License
    Rights ................................................................................................. 4

    A.  Have-Made Rights Allow Imation to Have Others Make, Use, or
        Sell the Licensed Products ........................................................ 5

    B.  Imation's Have-Made Rights Shield Its Unlicensed Third-Party
        Manufacturers from an Infringement Suit .................................. 7

II.  The Sole Purpose of the CLA's Expiration Provision Is to Limit the Patents
     Licensed Under the Agreement.......................................................... 8

    A.  By Modifying Only the Term "Licensed Patents" with the Expiration
        Provision, the Parties Intended to Limit Which Patents Would Be
        Licensed .................................................................................... 9

    B.  The CLA's Expiration Provision Is Typical for a Patent License
        Agreement ................................................................................. 10

III.  The Licenses Granted to Imation and its Subsidiaries in Article 2 Survive
      the March 1, 2000 Expiration Date ................................................... 11

    A.  The Parties' "Subsidiary" Definition Unambiguously Permits
        Licensing of Post-March 1, 2000 Entities................................... 13

        1.  Other courts have ruled that "hereafter" unambiguously extends
            licensing rights into the future without limitation..................... 14

        2.  The parties' unqualified use of "hereafter" demonstrates they
            intended future subsidiaries to be licensed with no temporal
            limitation..................................................................................... 16

B.     Unlike the Subsidiary Definition, the Use of "Hereafter" in the "Licensed Patents" Definition Is Expressly Limited by the Expiration Provision ................................................................................ 19

D.     Philips' Case Law Is Unpersuasive and Easily Distinguished .................. 20

IV.    Even If the Court Finds the Subsidiary Definition Ambiguous, the Definition Should Be Construed Against Philips, as the Drafter of the Provision............................................................................................................ 24

CONCLUSION ............................................................................................... 27

# TABLE OF AUTHORITIES

Page

**Cases**

*Armstrong World Indus., Inc. v. Aetna Ca. & Sur. Co.,*
  52 Cal. Rptr. 690 (Cal. App. 1996) ....................................................................... 21

*Batiste v. Island Records, Inc.,*
  179 F.3d 217 (5th Cir. 1999) ................................................................................. 15

*Carey v. U.S.*
  326 F.2d 975 (Ct. Cl. 1964) ..................................................................................... 7

*Chambers v. Time Warner, Inc.,*
  123 F. Supp. 2d 198 (S.D.N.Y. 2000),
  *vacated on other grounds,* 282 F.3d 147 (2d Cir. 2002) ........................................ 15

*Cook Inc. v. Boston Scientific Corp.,*
  208 F. Supp. 2d 874 (N.D. Ill. 2002) .............................................................. 11, 22

*Cornell Research Found., Inc. v. Hewlett-Packard Co.*
  No. 5:01-CV-1974, 2007 U.S. Dist. Lexis 89637 (N.D.N.Y. Jan. 31, 2007) .......... 7

*Cruden v. Bank of New York,*
  957 F.2d 961 (2d Cir. 1991) ..................................................................................... 9

*Cyrix Corp. v. Intel Corp.,*
  77 F.3d 1381 (Fed. Cir. 1996) .............................................................................. 6, 7

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,*
  375 F.3d 168 (2d Cir. 2004) ................................................................................... 24

*GE Engine Servs. UNC Holdings I, Inc. v. UNC Pac. Airmotive Corp.,*
  250 F. Supp. 2d 1237 (C.D. Cal. 2001) .............................................. 17, 20, 21, 22

*Greenfield v. Philles Records, Inc.,*
  790 N.E.2d 166 (N.Y. 2002) ............................................................................ passim

*Handeen v. Lemaire,*
  112 F.3d 1339 (8th Cir. 1997) .................................................................................. 3

*Hishon v. King & Spalding,*
  467 U.S. 69 (1984) ................................................................................... 3

*Hodosh v. Richardson-Vicks, Inc.*
  No. 88-3729, 1988 U.S. Dist. Lexis (D.N.J. Dec. 5, 1988) .................................... 6

*Intel Corp. v. Broadcom Corp.,*
  173 F. Supp. 2d 201 (D. Del. 2001) ....................................................... 7

*Intel Corp. v. ULSI Sys. Tech., Inc.,*
  995 F.2d 1566 (Fed. Cir. 1993) ............................................................ 7

*Maryland Cas. Co. v. W.R. Grace & Co.,*
  128 F.3d 794 (2d Cir. 1997) .................................................... 19, 20, 22

*Mastrobuono v. Shearson Lehman Hutton, Inc.,*
  514 U.S. 52 (1995 ....................................................................... 26

*Micro-Acoustics Corp. v. Bose Corp.,*
  493 F. Supp. 356 (S.D.N.Y. 1980) ......................................................... 18

*Miss. River Revival, Inc., v. City of St. Paul,*
  No. 01-1887, 2002 U.S. Dist. Lexis 25384 (D. Minn. Dec. 2, 2002) ...................... 3

*Morton v. Becker,*
  793 F.2d 185 (8th Cir. 1986) .............................................................. 3

*Nutter v. Messerli & Kramer, P.A.,*
  500 F. Supp. 2d 1219 (D. Minn. 2007) .................................................... 3

*Platinum Record Co. v. Lucasfilm, Ltd.,*
  566 F. Supp. 226 (D.N.J. 1983) ........................................................... 15

*PPG Indus. v. Guardian Indus. Corp.,*
  597 F.2d 1090 (6th Cir. 1979) ............................................................. 6

*R.H. Baker & Co. v. Smith-Blair, Inc.,*
  331 F.2d 506 (9th Cir. 1964) ............................................................. 18

*Reinhardt v. Wal-Mart,*
  078233, U.S. Dist. Lexis 32119 (S.D.N.Y. Apr. 18, 2008) ............................... 15

*Rentways, Inc. v. O'Neill Milk & Cream Co.,*
  126 N.E.2d 271 (N.Y. 1955) ...................................................... 22, 23, 26

*Revson v. Cinque & Cinque, P.C.*,
    221 F.3d 59 (2d Cir. 2000)..................................................................................... 26

*Rodolitz v. Neptune Paper Prods., Inc.*,
    239 N.E.2d 628 (N.Y. 1968) ................................................................................. 18

*Southwire Co. v. ITC*,
    629 F.2d 1332 (C.C.P.A. 1980) ............................................................................ 18

*Thorn EMI N. Am., Inc. v. Hyundai Electronics Ind. Co.*,
    No. 94-332-RRM, 1996 U.S. Dist. Lexis 21170 (D. Del. July 12, 1996) .............. 7

*Total Waste Mgmt. Corp. v. Commercial Union Ins. Co.*,
    857 F. Supp. 130 (D.N.H. 1994) ................................................................... 20, 22

*U.S. v. Radio Corp. of Am.*,
    117 F. Supp. 449 (D. Del. 1954) ............................................................ 10, 12, 22

*Westcott v. Omaha*,
    901 F.2d 1486 (8th Cir. 1990)................................................................................. 3

*Westmoreland Coal Co. v. Entech, Inc.*,
    794 N.E.2d 667 (N.Y. 2003) ................................................................................... 4

*White v. NFL*,
    899 F. Supp. 410 (D. Minn. 1995) ....................................................................... 14

**Statutes**

Fed. R. Civ. P. 12(d)........................................................................................... passim

**Other Authorities**

1 Jay Dratler, Jr., *Licensing of Intellectual Property*, § 1A.01[7] (2007).................. 11, 22

*Black's Law Dictionary* (8th ed. 2004) ........................................................................ 14

Harold Einhorn, *Patent Licensing Transactions* § 4.01[1] (2007) .................................. 11

*Merriam-Webster's Collegiate Dictionary* (10th ed. 1995)............................................. 14

**INTRODUCTION**

Philips' motion for judgment on the pleadings must be denied.  Philips asks this Court to interpret the cross-license to read that—while Imation's license did not expire on March 1, 2000—the same direct license to Imation's subsidiaries did expire.  Philips concedes that the cross-license directly licenses Imation and its subsidiaries.  Philips' Memorandum in Support of Its Motion for Judgment on the Pleadings ("Philips Memo.") 11 n.4.  The cross-license's definition of subsidiary contains no temporal limitation.  As a result, the only conclusion that can be drawn from the cross-license agreement's plain language is that the licenses granted to Imation's subsidiaries survive beyond the March 2000 expiration date.

The Patent Cross-License Agreement for Optical and Magneto-Optical Information Storage and Retrieval Technology ("cross-license agreement," "CLA," or "cross-license") defined "subsidiary" as "any corporation, firm, partnership, proprietorship or other form of business organization as to which the party *now or hereafter* has more than a fifty percent (50%) ownership interest."  CLA Art. 1 § 13 (emphasis added).  The plain and ordinary meaning of this provision establishes that the contracting parties intended to define as subsidiaries those organizations as of the date of the CLA's execution (now) and those formed after its execution (hereafter).  Philips' incorrect interpretation therefore depends on disregarding the contract's definition of subsidiary.

Contrary to this clear language, Philips would like this Court to read "now or hereafter" to mean "now or hereafter *during the term of the contract*."  Philips Memo.

14 (emphasis in original).  Had Philips wanted to limit the subsidiary definition using the March 1, 2000 expiration provision, it could have easily done so.  In fact, such a straightforward limitation is expressly found in the CLA's definition of "licensed patents."  CLA Art. 1 § 12(3).  But Philips did not, and the law does not permit Philips to now rewrite the contract to suit its contrary interpretation.  Consequently, while Philips asserts that Imation Corp.'s construction "simply defies logic" (Philips Memo. 19), it is Philips' interpretation that defies logic because it conflicts with the clear and express terms of the contract.

Because Philips' purported interpretation contradicts the express language of the cross-license, acceptance of that interpretation necessarily entails a determination that the agreement's terms are ambiguous.  If the terms at issue are characterized as ambiguous, then evidence outside the agreement itself should be considered in construing the agreement.   This automatically renders a motion for judgment on the pleadings inappropriate and requires denial of Philips' pending motion, particularly to allow all the parties "a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

For these reasons, Imation respectfully requests that the Court deny Philips' Motion for Judgment on the Pleadings.

## LEGAL STANDARD

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) should be granted "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Handeen v. Lemaire*, 112

F.3d 1339, 1347 (8th Cir. 1997) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73

(1984)).  This analysis requires that the court assume "well-pleaded factual allegations in

the complaint are true 'and construe[] the complaint, and all reasonable inferences arising

therefrom, most favorably to the pleader.'" *Westcott v. Omaha*, 901 F.2d 1486, 1488 (8th

Cir. 1990) (quoting *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986)).

When considering a motion for judgment on the pleadings under Federal Rule of

Civil Procedure 12(c), Rule 12(d) provides that the motion must be treated as one for

summary judgment pursuant to Rule 56 if "matters outside the pleadings are presented to

and not excluded by the court." *Nutter v. Messerli & Kramer, P.A.*, 500 F. Supp. 2d

1219, 1222 (D. Minn. 2007) (quoting Fed. R. Civ. P. 12(d)).  If the Court chooses to go

beyond the information contained in the pleadings, then Philips' motion must be

considered one for summary judgment under Rule 56 rather than for judgment on the

pleadings under Rule 12(c).  *See Miss. River Revival, Inc., v. City of St. Paul*, No. 01-

1887, 2002 U.S. Dist. Lexis 25384, *6 n.3 (D. Minn. Dec. 2, 2002) ("Since defendant

introduced evidence to support its claims and since the court has not excluded that

evidence, the court treats defendant's motion for judgment on the pleadings as a motion

for summary judgment.").   If the Court considers matters outside the pleadings, then

"[a]ll parties must be given a reasonable opportunity to present all the material that is

pertinent to the motion." Fed. R. Civ. P. 12(d).

## ARGUMENT

I.   **The Parties Intentionally Granted Each Other Broad Have-Made License Rights.**

The cross-license agreement remains at the core of this litigation. Executed in 1995 between Philips and Minnesota Mining and Manufacturing Company ("3M"), the contracting parties each recognized that the other party "has independently developed, and continues to develop, a body of optical and magneto optical information storage and retrieval technology." CLA at 1-2. Optical media technology was at a critical crossroads in 1995, with uncertainty about which format would be adopted. 3M and Philips drafted a reciprocal cross-license that allowed each to access the other's technology, no matter which technology "won" the format war. This intent is set forth in the CLA's preamble:

> 3M and PHILIPS ... each desire to grant royalty-free, nonexclusive patent licenses to the other party so that each party on a royalty-free basis may make, use, import, offer to sell, and sell other products incorporating optical and magneto optical information storage and retrieval technology patented by the other party [and] to obtain such license grants from the other party.

CLA at 2. When construing the cross-license, this intent of the parties must be kept in mind. *Westmoreland Coal Co. v. Entech, Inc.*, 794 N.E.2d 667, 670 (N.Y. 2003) (stating that contracts must be read as a whole, and if possible, courts must interpret them to effect the general purpose of the contract); *Greenfield v. Philles Records, Inc.*, 790 N.E.2d 166, 172-73 (N.Y. 2002) ("The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." (citation omitted)).

Found in the agreement's second article, the mutual license grants between 3M

and Philips give each party broad rights to use the other party's licensed patents. Philips'

grant to 3M demonstrates this breadth:

> PHILIPS agrees to grant and does hereby grant to 3M and its
> SUBSIDIARIES a personal, non-exclusive, indivisible, nontransferable,
> irrevocable, worldwide, royalty-free license under PHILIPS LICENSED
> PATENTS *to make, have made, make for others, use, lease, distribute,*
> *offer to sell, sell, import, or otherwise dispose* of LICENSED
> PRODUCTS. Further, PHILIPS agrees to grant and does hereby grant to
> 3M and its SUBSIDIARIES a personal[,] non-exclusive, indivisible,
> nontransferable, irrevocable, worldwide, royalty-free license under
> PHILIPS LICENSED PATENTS to practice any LICENSED PROCESS in
> the course of making, having made, making for others, using, leasing,
> distributing, offering to sell, selling, importing, or otherwise disposing of
> LICENSED PRODUCTS.

CLA Art. 2, § 2 (emphasis added). This license grant is identical in substance to 3M's

reciprocal grant to Philips. CLA Art. 2, § 1. As this language makes clear, the cross-

license directly licenses not only Imation but also its subsidiaries. Consequently, as

Imation subsidiaries (as defined by the CLA), GDM and Memorex are *directly* licensed

under the CLA, rather than being indirectly licensed through Imation. Philips is

attempting to circumvent the language of the CLA and deny Imation and its subsidiaries

the benefit of the agreement. This cannot be allowed.

### A.    Have-Made Rights Allow Imation to Have Others Make, Use, or Sell the Licensed Products.

In the patent license context, "have made" rights, like those granted in the CLA,

authorize the licensee to have a third party make the licensed products for the licensee,

who can then sell it to another. *Cyrix Corp. v. Intel Corp.*, 77 F.3d 1381, 1387 (Fed. Cir.

1996) (recognizing this "clear proposition" describing have-made rights). *See also*

*Hodosh v. Richardson-Vicks, Inc.*, No. 88-3729, 1988 U.S. Dist. Lexis, at *7 (D.N.J. Dec. 5, 1988) (accepting that "the words 'have made' in the context of a patent license merely authorize the licensee to have the invention made for the licensee by someone else" is the "commonly accepted meaning in patent license agreements").

Philips ignores the expansive license rights granted to Imation in Article 2, instead myopically focusing on the word "personal." *See* Philips Memo. 12-13. As an initial matter, the use of "personal" in the patent licensing context simply means the license agreement is not assignable. *PPG Indus. v. Guardian Indus. Corp.*, 597 F.2d 1090, 1093 (6th Cir. 1979). Imation and its subsidiaries have not assigned the cross-license agreement, but rather are operating under the rights directly granted to them. Philips' heavy reliance on the use of "personal" is therefore misplaced.

Second, Philips' focus on "personal" is misguided because it fails to take into account what have-made rights allow Imation and its subsidiaries to do. As an early and seminal case on have-made rights explained:

> Such a license is not restricted to production by the licensee personally or use by him personally or sales by him personally. It permits him to employ others to assist him in the production, and in the use and in the sale of the invention. Nor need he take any personal part in the production. A licensee having the right to produce, use and sell might be interested only in using the article or in selling it; in order to use it or sell it, the article must be produced; to have it produced, his license permits him to engage others to do all the work connected with the production of the article for him. Production of the article for the use of the licensee is production under the license.

*Carey v. U.S.*, 326 F.2d 975, 979 (Ct. Cl. 1964). Thus, although "a patent license is a limited grant of rights, unique to the recipient" (Philips Memo. 12), the unique rights

granted to Imation and its subsidiaries in this case authorize them to have others make, use, or sell the licensed products, rather than requiring them to do it personally.

**B.      Imation's Have-Made Rights Shield Its Unlicensed Third-Party Manufacturers from an Infringement Suit.**

Furthermore, despite Philips' contention to the contrary (Philips Memo. 12), the nature of have-made rights similarly shield a third-party manufacturer making product for the licensee from a patent owner's infringement suit.   "Under that [have-made] arrangement, to the extent the unlicensed party makes products for the licensee, the licensor/patent owner cannot sue the unlicensed party for patent infringement." *Intel Corp. v. Broadcom Corp.*, 173 F. Supp. 2d 201, 229 (D. Del. 2001) (relying on *Cyrix*, 77 F.3d at 1387; *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1570 (Fed. Cir. 1993)). *See also Cornell Research Found., Inc. v. Hewlett-Packard Co.*, No. 5:01-CV-1974, 2007 U.S. Dist. Lexis 89637, *174-75 (N.D.N.Y. Jan. 31, 2007) ("it is well established that because the products were made and sold by a licensed party, the licensor/patent owner cannot sue the third party for infringement); *Thorn EMI N. Am., Inc. v. Hyundai Electronics Ind. Co.*, No. 94-332-RRM, 1996 U.S. Dist. Lexis 21170, at *14-15 (D. Del. July 12, 1996) (construing patent license agreement under New York law) ("A license that grants 'have made' rights to a licensee protects a third party manufacturer to the extent that it produces for the use or sale of the original licensee.").   As established case law confirms, the have-made rights granted to Imation and its subsidiaries broaden the scope of the "personal" license well beyond Philips' overly restrictive interpretation.

II.     **The Sole Purpose of the CLA's Expiration Provision Is to Limit the Patents Licensed Under the Agreement.**

While Philips advocates a narrow interpretation of the license grant, it conversely seeks to expand the scope of the cross-license's expiration provision.   But Philips' construction of the expiration provision is equally misguided.

Constituting the whole of Article 4, the expiration provision states: "The term of this Agreement shall expire on March 1, 2000, except that any patent license which has been granted under ARTICLE 2 shall continue thereafter for the term provided in ARTICLE 3."  By its own language then, the expiration provision is interconnected with other specifically identified provisions of the CLA, namely Articles 2 and 3.

Article 2 is of course the grant of royalty-free cross-licenses between the parties, including have-made rights.  The license grant gives the parties and their subsidiaries a license to each other's "licensed patents," another term defined by the CLA.

For its part, Article 3, entitled "Term of Patent License Grants," provides:  "The term of the licenses granted under ARTICLE 2 shall commence on the effective date of this Agreement and shall continue as to each LICENSED PATENT for its life, or for such shorter period as may be imposed in any country by the government of that country."  Thus, for both Articles 2 and 3, the defined term "licensed patents" plays an integral part in their interpretation.

### A. By Modifying Only the Term "Licensed Patents" with the Expiration Provision, the Parties Intended to Limit Which Patents Would Be Licensed.

The parties to the cross-license defined "licensed patents" as follows:

"LICENSED PATENTS" shall mean any and all patents, utility models, inventor certificates, and design patents and registrations of all countries of the world (including any applications, continuations, continuations-in-part, divisionals, reissues, reexamined patents, or extensions thereof) which:

    (1)    are owned or controlled by the granting party or any of its SUBSIDIARIES such that such party or its SUBSIDIARIES now has or hereafter obtains the rights to grant the licenses within the scope of this Agreement;

    (2)    relate to optical or magneto-optical information storage and retrieval technology; and

    (3)    have a filing date, or claim priority from a date, or are or were entitled to claim priority from a date, *on or before the expiration date of this Agreement as set forth in Article 4, herein*.

CLA, Art. 1 § 12 (emphasis added).

The parties expressly associated the definition of "licensed patents" with the March 2000 expiration date. In fact, Article 1, § 12(3) is the *only* provision in the cross-license agreement that cross-references Article 4's expiration provision. In construing a contract under New York law, courts must consider the entire contract. *Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir. 1991) (applying New York law). By reading all these provisions together, the parties' intent is clear—they used the March 1, 2000 expiration provision solely to limit which patents would be licensed under the CLA.

Established case law likewise supports the interpretation that the cross-license agreement's expiration provision serves to limit the patents licensed under the agreement.

In *U.S. v. Radio Corp. of Am.*, the court construed a patent license agreement with provisions similar to the ones at issue here.  117 F. Supp. 449, 454 (D. Del. 1954).  The termination date of the *RCA* license agreement was December 31, 1954, but, similar to the CLA, the *RCA* agreement further stated that the licenses granted under it were to continue in force after that date, so long as any patent licensed under it remains unexpired.  *Id.* at 450.  As with the CLA's definition of "licensed patents," the license agreement in *RCA* defined the "patents included in this agreement" by specific reference to the agreement's termination date.  *Id.* at 452.  Under those circumstances, the court concluded that "*the sole purpose* of the termination date… is to operate as a cutoff date after which new inventions by the parties shall not become subject to the agreement." *Id.* at 454 (emphasis added).  As in *RCA*, the sole purpose of the CLA's Article 4 expiration provision is to operate as a cutoff date after which new patents by the parties or their subsidiaries would not become a licensed patent under the cross-license.

**B.    The CLA's Expiration Provision Is Typical for a Patent License Agreement.**

The parties' use of an expiration provision to essentially close the pool of patents licensed under the CLA is the typical method of drafting patent license agreements.  As a recent commentator remarked, temporal limitations, like the one Philips is asserting, "*are not the rule*.  Many, if not most, licenses of intellectual property run for the duration of the licensed intellectual property[.]  Thus a typical patent license runs for the entire term of the patent until it expires."  1 Jay Dratler, Jr., *Licensing of Intellectual Property*, § 1A.01[7] (2007) (emphasis added).   This typical arrangement is attributed to the

relatively short terms of patents and the high level of investment required to exploit them, which makes early termination provisions in patent licensing agreements rare. *Id.*

In fact, the patent licensing treatise Philips cites to support its motion agrees that the CLA's expiration provision is typical: "It is usual to limit the patents licensed at least to those which are based on inventions made before a fixed date" and "unusual to have a license terminate before the expiration of the licensed patents." Harold Einhorn, *Patent Licensing Transactions* § 4.01[1] (2007) (source cited in Philips Memo. at 13). Indeed, "[i]n the absence of an expressed period of duration, a license is implicitly coextensive in time with the unexpired patent life." *Id.* (footnote omitted). Here, the parties expressly connected the term of the patent licenses to their unexpired patent lives.

Philips ignores that patent license agreements differ from standard contracts in some aspects. "Disputes surrounding patent licenses are not run-of-the-mill contract cases; these agreements have unique attributes that set them apart from other contractual arrangements." *Cook Inc. v. Boston Scientific Corp.*, 208 F. Supp. 2d 874, 878 (N.D. Ill. 2002) (cited in Philips' Memo at 12-13). Expiration provisions, like the one at issue here, illustrate the uniqueness of patent license agreements. And as is typical in patent license agreements, the CLA's expiration date serves solely to limit which patents are licensed under the agreement.

## III.   The Licenses Granted to Imation and its Subsidiaries in Article 2 Survive the March 1, 2000 Expiration Date.

Although the expiration provision limits which patents are licensed, the licenses themselves that are granted under Article 2 do survive the expiration date.   In *RCA*, the

court held that the rights included within the scope of the licenses granted survived the termination date "to the same extent as the licenses of which they are a part." 117 F. Supp. at 453. The patent license agreement there granted a royalty-free license to the plaintiff RCA, including the express right to sublicense the licensed patents. *Id.* at 451-52. Similar to Philips, the *RCA* defendants contended that the right to sublicense ended with the termination date because the sublicensing right was a "separate and independent right not included in the licenses granted to RCA and that it terminate[d] on [the] December 31, 1954 [expiration date]." *Id.* at 453. The court rejected the defendants' argument, finding that the language of the license-granting provision "clearly and unambiguously includes sub-licensing rights with the scope of the licenses which RCA receives... and that these sub-licensing rights accordingly survive the termination date of December 31, 1954 to the same extent as the licenses of which they are a part." *Id.* Thus, the licenses granted were to continue unaffected and of the same scope and character during unexpired terms of patents. *Id.*

As in *RCA*, Imation's rights under the licenses survive the expiration of the CLA, including the licensing rights granted to Imation's subsidiaries. As it must, Philips has conceded that the licenses granted to Imation and its subsidiaries extend for the life of each licensed patent and do not end on March 1, 2000. CLA Art. 3; Philips Memo. 5; Philips' Amended Answer to Complaint, Counterclaims, and Third-Party Complaint (Dkt. # 83) ("Philips Answer") 34, ¶ 66. But what Philips fails to address is the entire scope and character of the license granted to Imation and its subsidiaries, as that latter term is defined by the cross-license.

In particular, Philips asks the Court to disregard the plain meaning of the subsidiary definition in the CLA. Although Philips acknowledges that "[t]he license grant in Article 2 is *not* granted solely to Imation... ; rather the license grant itself is to Imation and 'its SUBSIDIARIES'" (Philips Memo. 11 n.4; emphasis in original), it nevertheless contends that "[i]f an entity was not a 'subsidiary' when the CLA experied [*sic*: expired], it is not granted a license merely because it became a subsidiary after the CLA expired." Philips Memo. 13. Philips would like the Court to interpret the cross-license to read that Imation's license did not expire on March 1, 2000, but that the same direct license to Imation's subsidiaries did expire.

Not only does Philips' argument conflict with the law that the licenses continue after the license agreement's expiration date with the same scope and character as before the expiration date, but its argument conflicts with the plain language of the parties' definition of subsidiary.

## A.    The Parties' "Subsidiary" Definition Unambiguously Permits Licensing of Post-March 1, 2000 Entities.

The parties agreed that the definition of "subsidiary" means:

> any corporation, firm, partnership, proprietorship or other form of business organization as to which the party now or hereafter has more than a fifty percent (50%) ownership interest or, if not more than fifty percent ownership, then the maximum ownership interest it is permitted to have in the country where such business organization exists.

CLA Art. 1 §13. This provision defeats Philips' interpretation of the cross-license. Under New York law, a court construing a contract should give its words their plain and ordinary meaning. *White v. NFL*, 899 F. Supp. 410, 414 (D. Minn. 1995) (applying New

York law). The plain and ordinary meaning of "hereafter" is "at some future time" or "after this in sequence or in time." *Black's Law Dictionary* (8th ed. 2004); *Merriam-Webster's Collegiate Dictionary* (10th ed. 1995). No time limitation is found in these meanings. In the context of the subsidiary definition, then, "hereafter" simply means after the execution of the cross-license with no additional temporal qualification. Accordingly, by agreeing to use "hereafter," the parties have indicated their intent to accept the possibility that future subsidiaries will become licensed under the CLA whether those entities became subsidiaries before or after the March 1, 2000 expiration date.

### 1.     Other courts have ruled that "hereafter" unambiguously extends licensing rights into the future without limitation.

In another intellectual property licensing context, courts hold that the term "hereafter" is unambiguous and that the parties' use of the term in a license agreement extends the licensing rights into the future, even as to unknown subjects. Courts have construed the term in several licensing cases concerning copyrighted music. The courts ruled that the license agreement encompassed future types of recording media, even those unknown at the time of the license agreement's execution, where the contract contained the language "by any method now or hereafter known" or equivalent language.[1] *Greenfield v. Philles Records, Inc.*, 790 N.E.2d 166, 172-73 (N.Y. 2002). *Accord Batiste v. Island Records, Inc.*, 179 F.3d 217, 223 (5th Cir. 1999); *Reinhardt v. Wal-Mart*,

---

[1] Like in the present case, these courts relied upon "long-settled common-law contract rules still govern[ing] the interpretation of agreements" in analyzing the licensing agreements before them. *Greenfield*, 790 N.E.2d at 170.

078233, U.S. Dist. Lexis 32119, *15-16 (S.D.N.Y. Apr. 18, 2008); *Chambers v. Time Warner, Inc.*, 123 F. Supp. 2d 198, 200 (S.D.N.Y. 2000), *vacated on other grounds*, 282 F.3d 147 (2d Cir. 2002). *See also Platinum Record Co. v. Lucasfilm, Ltd.*, 566 F. Supp. 226, 227 (D.N.J. 1983) ("This language is extremely broad and completely unambiguous and precludes any need in the Agreement for an exhaustive list of specific potential uses of film."). As the court in *Reinhardt* explained in construing a licensing provision for all forms of reproduction "now or hereafter known":

> This language is clear and unambiguous and conveys a definite meaning. ... The phrase "now or hereafter known," when referring to forms of reproduction, reveals that future technologies are covered by the agreement. ***This language creates an expansive rather than a restrictive conveyance of rights*** . . . This unambiguous language forecloses other interpretations and the need to consider extrinsic evidence.

2008 U.S. Dist. Lexis 32119, at *15-16 (emphasis added).

The New York Court of Appeals' decision in *Greenfield* is an excellent example of the expansive scope of the term "hereafter." The agreement in *Greenfield* resembles the CLA here because it too had a five-year term, yet licensed the defendants to use the recordings of performances made during those five years after the five-year term expired. *Id.* at 168-69. Despite the five-year term, New York's highest court determined that the parties' use of "hereafter" in the contract licensed the defendants for "whatever future formats [that may] evolve from new technologies." *Id.* at 171-72. *Greenfield* and other similar licensing decisions confirm that the plain and ordinary meaning of "hereafter" is sufficiently broad and expansive so that the CLA allows future subsidiaries—without any time limit—to fall under the licenses granted to Imation and its subsidiaries.

## 2. The parties' unqualified use of "hereafter" demonstrates they intended future subsidiaries to be licensed with no temporal limitation.

The plain and ordinary meaning of "hereafter" indicates the parties' intent to cover future subsidiaries without time limits. By defining subsidiary to include business organizations "as to which the party *now or hereafter* has more than a fifty percent (50%) ownership interest," the contracting parties intended to include those organizations as of the date of the CLA's execution and those later acquired or formed. *Id.* As a result, despite Philips' contention that it "did not in the CLA grant a license to non-existent entities" or "unidentified parties" (Philips Memo. 12), that is precisely what the contracting parties did by defining "subsidiary" to include later-acquired, but unidentified, subsidiaries.

Likewise, the parties can assign, license, or transfer the cross-license to another entity that acquires substantially all of the business of a party to which the CLA pertains, which is what occurred with the CLA's transfer from 3M to Imation. CLA Art. 9 § 6. This is another example within the CLA which permitted the parties to pass license rights to an unidentified entity that did not exist at the time of the agreement's execution or expiration date.

Moreover, nothing in the cross-license precludes Imation from acquiring more businesses in the future, folding those businesses into Imation, and selling products by those businesses as licensed under the CLA. Philips does not dispute Imation's right to do so, as evidenced by its decision to not challenge in its counterclaims Imation's acquisition of TDK's recording media business. *See* Complaint (Dkt. #1) at ¶ 64;

Philips' Answer (Dkt. #8) at ¶64.   What Philips is advocating produces an absurd result—that businesses acquired by Imation through asset acquisition are licensed, but those businesses acquired as newly formed subsidiaries are not.   Philips' argument, however, conflicts with the express words of the cross-license agreement.

Philips later concedes that unidentified companies may become licensed as subsidiaries, but in the same breath advocates an interpretation of the "subsidiary" definition that contradicts its unambiguous language.   Philips argues that "the word 'hereafter' in the definition is included to provide that entities becoming subsidiaries *during the term of the contract* will be entitled to a license, rather than limiting the licenses to those 3M/Imation subsidiaries in existence on the contract's effective date." Philips Memo. 14 (emphasis in original).   Philips is wrong.   Nowhere in the "subsidiary" definition did the parties indicate that "hereafter" is limited in the manner Philips now espouses.   3M and Philips were sophisticated companies, represented by competent counsel, who drafted this cross-license agreement.   They could have easily qualified "subsidiary" to include only those acquired or formed during the term of the CLA, but they chose not to define subsidiary in that way.

A decision cited by Philips demonstrates just how simple it would be to draft the provision Philips desires.   Philips Memo. 15.   In that insurance coverage case, one of the provisions at issue defined "named insured" to mean "any corporation acquired or formed *during the policy period* as a subsidiary."   *GE Engine Servs. UNC Holdings I, Inc. v. UNC Pac. Airmotive Corp.*, 250 F. Supp. 2d 1237, 1241 (C.D. Cal. 2001) (applying

80105415.2

California law; emphasis in original). These unambiguous words indicated the parties' intentional limitation on later-acquired corporations.

In contrast, 3M and Philips did not restrict the "subsidiary" definition to only those entities acquired or formed during the term of the CLA. Instead, they chose the open-ended and unqualified term "hereafter."[2] Philips asks this Court to read into the cross-license agreement an implied prohibition against licensing subsidiaries acquired or formed after March 1, 2000, but Philips' request is not supported by the unambiguous language of the CLA. "If the contract is more reasonably read to convey one meaning, the party benefited by that reading should be able to rely on it; the party seeking exception or deviation from the meaning reasonably conveyed by the words of the contract should bear the burden of negotiating for language that would express the limitation or deviation." *Greenfield*, 790 N.E.2d at 172-73 (citation omitted). As much as it may want to, Philips cannot now rewrite the agreement to support its view. *Southwire Co. v. ITC*, 629 F.2d 1332, 147 (C.C.P.A. 1980) (applying New York law to construe have-made rights under license agreement). *See also Rodolitz v. Neptune Paper*

---

[2] Philips' red herring that "countless entities" would become licensed subsidiaries under the CLA "in perpetuity" likewise disregards the unambiguous language of the cross-license agreement. Philips Memo. 11, 14. Subsidiaries are only licensed under the cross-license agreement if they satisfy the agreement's definitional requirement that a party has more than a fifty-percent ownership interest in the subsidiary. CLA Art. 1 § 13. Moreover, the CLA's license rights expire as the individual patents themselves naturally expire. *Id.* at Art. 3. Of course, after the licensed patents expire, anyone can use the patented technology. *Micro-Acoustics Corp. v. Bose Corp.*, 493 F. Supp. 356, 367 (S.D.N.Y. 1980) ("When a patent expires it becomes part of the public domain and anyone has a right to practice the teachings of the patent.") (citing *R.H. Baker & Co. v. Smith-Blair, Inc.*, 331 F.2d 506, 509 n.5 (9th Cir. 1964)).

*Prods., Inc.*, 239 N.E.2d 628, 630 (N.Y. 1968) (contract cannot be rewritten if doing so would contradict the contract's clearly expressed language).

**B.    Unlike the Subsidiary Definition, the Use of "Hereafter" in the "Licensed Patents" Definition Is Expressly Limited by the Expiration Provision.**

Philips makes another meritless argument based on the use of "now has or hereafter obtains" in the definition of "licensed patents." Philips Memo. 16-18.  As previously explained, the definition of "licensed patents" is limited by the March 1, 2000 expiration date because it serves to limit the particular patents falling within the CLA. *See infra* at II.A.  Philips argues that because both definitions use the words "now" and "hereafter," both definitions are subject to the March 1, 2000 expiration date.  Philips Memo. 18.

Philips' bootstrapping ignores the express limitation placed on the "licensed patents" definition that is absent in the "subsidiary" definition.  As Philips itself sets forth, contract terms "normally have the same meaning throughout the [contract] *in the absence of a clear indication that different meanings were intended*."  Philips Memo. 16 (alteration in original; emphasis added) (citing *Maryland Cas. Co. v. W.R. Grace & Co.*, 128 F.3d 794, 799 (2d Cir. 1997)).  Here, the CLA contains a clear indication that the parties intended different meanings between the term "hereafter" used in "licensed patents" and the one used in "subsidiary."

The definition of "licensed patents" is expressly limited by Article 4's expiration date.  "Licensed patents" is defined to include those that have a filing date or can claim priority from a date, "*on or before the expiration date of this Agreement as set forth in*

*Article 4, herein*." CLA Art. 1 § 12(3).  In contrast, the definition of "subsidiary" contains no such restriction—nor any reference at all to the expiration provision. CLA Art. 1 § 13.  In short, while the "now has or hereafter obtains" language in the "licensed patents" definition is specifically tied to the expiration date of March 1, 2000, the "now or hereafter" language in the "subsidiary" definition is not.

Accordingly, despite Philips' claim that "[t]here is no basis for Imation's proposed construction" and that it "makes no sense" (Philips Memo. 18), it is Philips' construction that ignores the contracting parties' clear indication that different meanings were intended.[3]  If Philips and 3M had intended that the March 1, 2000 expiration date would apply to the definition of subsidiary, they could have added that limitation as easily as they did to the licensed patents definition.  But they purposefully did not.  Accordingly, Philips' contrary construction must be rejected.

### D.    Philips' Case Law Is Unpersuasive and Easily Distinguished.

The cases on which Philips relies simply do not apply.  Philips cites no judicial decision in which the court is construing an expiration provision in a patent license agreement.  For its expiration arguments, Philips relies on several inapposite insurance coverage decisions.  Philips Memo. 15-16 (citing *GE Engine Servs. UNC Holdings I, Inc. v. UNC Pac. Airmotive Corp.*, 250 F. Supp. 2d 1237 (C.D. Cal. 2001) (applying California law); *Total Waste Mgmt. Corp. v. Commercial Union Ins. Co.*, 857 F. Supp.

---

[3] Philips' assertion that licensing post-March 1, 2000 subsidiaries would "impermissibly read the expiration provision out of the CLA" is likewise unavailing. Philips Memo. 14. The parties used the expiration provision to limit the patents licensed under the agreement. *See infra* II.A.  Imation's interpretation gives the expiration provision its intended purpose—indeed, its sole purpose. *RCA*, 117 F. Supp. at 454.

130 (D.N.H. 1994) (applying New Hampshire law); *Maryland Cas. Co. v. W.R. Grace &*
*Co.*, 128 F.3d 794 (2d Cir. 1997)).  *GE Engine* is the only decision in which the court was
construing a phrase containing the word "hereafter."  But, as previously explained, the
case shows just how easy it would have been for Philips to draft the "subsidiary"
definition to limit the license rights to only subsidiaries acquired before the March 1,
2000 expiration date.  *See infra* III.A.2.  The parties in *GE Engine* drafted a provision that
limited coverage for subsidiaries "acquired or formed during the policy period."  250 F.
Supp. 2d at 1241.

Moreover, the *GE Engine* court was analyzing insurance policies under specific
insurance-related interpretation law.  Applying the three-step process for insurance policy
interpretation required under California law, *GE Engine* interpreted numerous insurance
policies from various insurers to determine who was the "named insured" for a CERCLA
site clean-up.  250 F. Supp. 2d at 1241-42.  The definitions under the various contracts
differed, even those from the same insurer.  *Id.*  Some simply defined the named insured
as the plaintiff and its subsidiaries, some as subsidiaries "as now exist or may hereafter be
constituted," and some defined it as subsidiaries "acquired or formed during the policy
period."  *Id.*  Like all insurance policies, the ones in *GE Engine* had a specified policy
period.  Because "the period of time during which the insurance policy is effective is an
essential element of a liability insurance contract," the court relied on an earlier
California state court decision that concluded that "'the word 'hereafter' cannot be
reasonably read as referring to any time in the indefinite future,' when read in

conjunction with the policy period limitation." *Id.* at 1243 (citing *Armstrong World Indus., Inc. v. Aetna Ca. & Sur. Co.*, 52 Cal. Rptr. 690, 726 (Cal. App. 1996)).

By relying on this insurance coverage case that must apply its own unique interpretation rules, Philips once again ignores that patent license agreements "have unique attributes that set them apart from other contractual arrangements." *Cook*, 208 F. Supp. 2d at 878 (cited in Philips' Memo at 12-13).   Rather than containing the essential element of a policy period limitation, most patent license agreements license a party to practice the patented invention for the life of the patent. *RCA*, 117 F. Supp. at 454; 1 Dratler at § 1A.01[7].  Consequently, the narrow construction followed by the court in *GE Engine* simply distinguishes it from the patent cross-license at issue here.

The other two insurance coverage decisions Philips relies upon do not even construe the term "hereafter." *Maryland Cas.*, 128 F.3d at 799 (construing insurance term of art "occurrence"); *Total Waste Mgmt.*, 857 F. Supp. at 144-146 (applying New Hampshire law to construe "insured" to determine if pre-acquisition activities of a company acquired after the policy's expiration were retroactively covered under the insurance policies).[4]   By relying on these non-controlling and easily distinguished decisions, Philips has shown just how wrong its interpretation of the CLA is.

Philips also cites a decision in which the court was construing a contract to lease milk trucks.  Philips Memo. at 14 (citing *Rentways, Inc. v. O'Neill Milk & Cream Co.*,

---

[4] What Philips quotes with some dexterity from the *Total Waste Management* decision is an unpublished state trial court opinion from Wisconsin, in which the court was addressing the retroactive effect of insurance policies.  Philips Memo. 15.  As with the other insurance coverage decisions Philips cites, this Wisconsin trial court opinion is inapposite to the patent license agreement at issue here.

126 N.E.2d 271, 273 (N.Y. 1955)).   The lease agreement in *Rentways* contained a provision specifying a commencement date for the fixed, three-year lease term.   126 N.E.2d at 272.   After the plaintiff delivered all the promised milk trucks within the agreed-upon 90-day period, then the three-year lease would start.   The plaintiff in *Rentways*, however, tried to extend the three-year period by delaying the delivery of the last milk truck, thereby postponing the commencement of the three-year term. *Id.* at 272-73.   The court rejected the plaintiff's attempt to extend the term of the contract through its own breach of the contract. *Id.* at 273.   *Rentways* is thoroughly distinguishable from the present case.   Unlike the CLA, the *Rentways* contract contained a fixed three-year term, after which the parties' leasing or any other rights completely ended.   The decision simply does not support Philips' expiration argument.

The express terms of the cross-license agreement directly license subsidiaries "now or hereafter" acquired or formed by Imation.   This unambiguous authorization endured with the same scope and character even after the March 1, 2000 expiration date passed.   As a result, Memorex, GDM, and any other "subsidiary" satisfying the definition under Article 1, § 13, are properly licensed under the CLA.   This interpretation is the only correct way to construe the cross-license agreement as written.   Philips' contrary interpretation—that the license rights for subsidiaries expired in 2000 but the license rights for Imation continued—is not supported by the language of the contract and therefore must be rejected.

**IV.    Even If the Court Finds the Subsidiary Definition Ambiguous, the Definition Should Be Construed Against Philips, as the Drafter of the Provision.**

Because Philips' interpretation contradicts the unambiguous terms of the contract, to construe the CLA as Philips requests would necessarily require the Court to conclude that the terms of the contract are ambiguous.   Under New York law, contracts are to be construed in accord with the parties' intent, the best evidence of which is the words of the agreement itself. *Greenfield*, 780 N.E.2d at 170.  Where a written agreement is complete, clear, and unambiguous on its face, courts must enforce it according to the plain meaning of its terms. *Id.*  Courts may consider evidence of the parties' intent outside the written contract only if the agreement is ambiguous, which is an issue of law. *Id.*  Ambiguity exists if the agreement is reasonably susceptible of more than one meaning. *Id.*  "Unless for some reason an ambiguity must be construed against the plaintiff, a claim predicated on a materially ambiguous contract term is not dismissible on the pleadings." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004) (citation omitted; applying New York law).

The only basis for accepting Philips' expiration argument is to find that the contract term "hereafter" is ambiguous.  This requires concluding that the parties' use of that term was not to convey its plain and ordinary meaning—defining subsidiaries to include those formed after the CLA's execution—but that the parties intended to write the subsidiary definition as those subsidiaries formed "***during the term of the contract***." Philips Memo. 14 (emphasis in original).  Because these are not the words the parties put

80105415.2

24

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

IMATION CORP.,

     Plaintiff,

         v.

KONINKLIJKE PHILIPS ELECTRONICS
N.V., U.S. PHILIPS CORPORATION,
and PHILIPS ELECTRONICS NORTH
AMERICA CORPORATION,

     Defendants.

KONINKLIJKE PHILIPS ELECTRONICS
N.V., U.S. PHILIPS CORPORATION, and
PHILIPS ELECTRONICS NORTH
AMERICA CORPORATION,

     Counterclaim and Third-Party Plaintiffs,

         v.

IMATION CORP.,

     Counterclaim Defendant

     -and-

MOSER BAER INDIA LIMITED, GLOBAL
DATA MEDIA FZ-LLC, MBI
INTERNATIONAL FZ-LLC, MBI
INTERNATIONAL SERVICES PRIVATE
LIMITED, MBII INDIA MARKETING
PRIVATE LIMITED, GLYPHICS MEDIA
INC., and MEMOREX PRODUCTS, INC.,

     Third-Party Defendants.

CIV. A. No. 07-3668 (DWF/AB)

**PLACEHOLDER FOR
PAGES 25-27 OF IMATION
CORP.'S MEMORANDUM
OF LAW IN OPPOSITION
TO PHILIPS' MOTION
FOR JUDGMENT ON THE
PLEADINGS**

This document is a place holder for the following item(s) which are filed in conventional or physical form with the Clerk's Office:

80162228.1

**Placeholder for pages 25-27 of Imation Corp.'s Memorandum Of Law In Opposition To Philips' Motion For Judgment On The Pleadings – Refers to documents designated by Defendants as "Confidential - Attorneys' Eyes Only."**

If you are a participant in this case, this filing will be served upon you in conventional format.

This filing was not e-filed for the following reason(s):

___ Voluminous Document* (Document number of order granting leave to file conventionally: ___ )

___ Unable to Scan Documents (e.g., PDF file size of one page larger than 2MB, illegible when scanned)

___ Physical Object (description):

___ Non Graphical/Textual Computer File (audio, video, etc.) on CD or other media

_X_ Item Under Seal pursuant to a court order* (Document number of protective order: 40 )

___ Item Under Seal pursuant to the Fed. R. Civ. P. 5.2 and Fed. R. Crim. P. 49.1
        (Document number of redacted version: ___ )

___ Other (description):

* Filing of these items requires Judicial Approval.

E-file this place holder in ECF in place of the documents filed conventionally.  File a copy of this Placeholder and a copy of the NEF with the Clerk's Office along with the conventionally filed item(s).

80162228.1

Dated:  June 20, 2008.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

By:  s/Ronald J. Schutz
Ronald J. Schutz (#130849)
rjschutz@rkmc.com
B. Todd Jones (#015071X)
Richard M. Martinez (#225411)
Jennifer L. McKenna (#0295802)
Allen A. Slaughter (#0301668)
Amy N. Softich (#0352196)
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
2800 LaSalle Plaza
800 La Salle Avenue
Minneapolis, MN 55402
Telephone:  (612) 349-8500
Facsimile:  (612) 339-4181

*Attorneys for Imation Corp., Global Data Media FZ-LLC, MBI International FZ-LLC, MBI International Services Private Limited, MBII India Marketing Private Limited, Glyphics Media Inc. and Memorex Products, Inc.*

80105415.2

28